IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEREMY LIEBBE, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 3:16-CV-2413-L |
| DALLAS INDEPENDENT SCHOOL DISTRICT, | § § § | |
| *Defendant*. | § § § | |

## DECLARATION OF MIKE MILES

| | |
|---|---|
| STATE OF COLORADO | § |
| | § |
| COUNTY OF EL PASO | § |

1.  My name is F. Mike Miles. I am fully competent to make this Declaration and, by virtue of my former position as Superintendent for Dallas Independent School District ("Dallas ISD" or the "District") and as the District official who made the decision to terminate Jeremy Liebbe, I have personal knowledge of all facts stated herein, and state that they are all true and correct.

2.  I hold a Bachelor of Science in engineering from the United States Military Academy at West Point and a Bachelor of Arts in Slavic languages and literature from the University of California at Berkeley, as well as a Master's of International and Public Affairs from Columbia University. I began my work in education as a teacher at Fountain-Ft. Carson High School in 1995. Over the years, I have served as a teacher, a principal, an assistant superintendent for curriculum and instruction, and as the superintendent of two urban school districts. I served as the Superintendent of Harrison School District 2 in Colorado Springs from

2006 to 2012 and became the Superintendent of Dallas ISD, the second largest school district in Texas and the sixteenth largest nationwide, in July 2012.  My final day of employment with the District was July 1, 2015.  I currently serve as Chief Executive Officer of Third Future Schools, a charter school management organization in Colorado.

3. As Superintendent of Dallas ISD, I was responsible for all duties provided by Texas state law and in my employment contract with the District.  Attached hereto as **Exhibit 1** is a true and correct copy of my Superintendent's Employment Contract with Dallas ISD.  Under this contract, I was tasked with performing my duties in accordance with District Board policies including BJA (Local) and its legal counterpart BJA (Legal) and additional duties assigned by the Dallas ISD Board of Trustees (the "Board").  Attached hereto as **Exhibit 2** is a true and correct copy of Board policy BJA (Local) that was in effect during my tenure as Dallas ISD's Superintendent.  Attached hereto as **Exhibit 3** is a true and correct copy of BJA (Legal) which was in effect during my tenure as Dallas ISD's Superintendent.

4. As Dallas ISD's Superintendent, I reported directly to the Dallas ISD Board of Trustees (the "Board").  In my capacity as Superintendent for the District, I managed the day-to-day operations of Dallas ISD.  This authority included overseeing the operations of Human Capital Management ("HCM"), which managed personnel issues in the District and was led by a Chief of Human Capital Management.  In 2014, the Chief of HCM was Carmen Darville.

5. As Dallas ISD's Superintendent, under Board policy and my Superintendent's contract, I had the authority to hire and dismiss at-will employees.  My authority to hire and dismiss at-will employees was subject to Dallas ISD Board policy DCD (Local).  A true and correct copy of Board policy DCD (Local) is attached hereto as **Exhibit 4**.  Under Board policy DCD (Local), my decision to terminate at-will employees could not be based on an employee's

exercise of his constitutional rights or based unlawfully on an employee's race, color, religion, sex, national origin, disability, age, or veteran status.

6. When I became Dallas ISD's Superintendent, there was an investigative body, the Office of Professional Responsibility ("OPR") that investigated fraud, waste, and abuse. At the time, OPR reported directly to the Superintendent. During the fall of 2013, OPR was subsumed by the Office of Internal Audit ("OIA"). OIA reports to Dallas ISD's Board through the Board's Audit Committee. When OPR was subsumed by OIA, it ceased to exist as an independent entity. OIA, which does not report to the Superintendent, began performing OPR's prior investigative functions as it relates to financial fraud, waste, and abuse.

7. In late 2013, around the time OPR was subsumed into OIA, I worked with HCM to create the Professional Standards Office ("PSO"), an investigative unit that would be housed in HCM. I worked to develop PSO to replace some of the non-financial investigative functions previously performed by OPR. Specifically, OIA would now investigate financial fraud, waste, and abuse within the District. But PSO would assume the functions of investigating general allegations of employee misconduct, such as Equal Employment Opportunity ("EEO") complaints, suspected child abuse, non-financial fraud, University Interscholastic League ("UIL") violations, employee arrests, and academic testing violations.

8. I helped design PSO to serve as a resource for Dallas ISD managers and employees to manage concerns and complaints regarding employee behavior. The objective of PSO was to create a high-performing culture and a positive work environment, while appropriately upholding professional standards for all Dallas ISD employees. When PSO was created, it employed both Employee Advocates—who assist employees in interpreting policies

and procedures and provide confidential support and consultation to help employees resolve disputes—and Investigators.

9.  Before I made the decision to create PSO, I had become disenchanted with some of the investigative techniques previously used by OPR. I believed that OPR had been too aggressive and adversarial with employees and had employed law enforcement or "big brother" style tactics during employee investigations, such as use of a two-way mirror that employees found intimidating. I viewed these authoritarian tactics as inappropriate for a human resources investigation. I did not believe that human resources investigations should be conducted in such a surreptitious and adversarial manner. Because PSO was going to be housed in HCM and serve a human resources investigative role, I wanted PSO to take a different approach in its human resources investigations. I envisioned that PSO investigations would be more employee-friendly, less antagonistic and accusatory, and employ human resources investigative techniques designed to facilitate a positive work environment as opposed to interrogation techniques used in law enforcement investigations.

10.  Though I was not involved in the hiring decision, I was aware that Jeremy Liebbe was hired as the Manager of PSO in or around January 2014. I believe I first met Jeremy Liebbe in the Spring of 2014 as part of his role in PSO's investigations of potential violations of UIL athletic participation rules by various Dallas ISD employees. Other than my limited interaction with Mr. Liebbe regarding the UIL athletics investigations, I had very little, if any, contact with him.

11.  In mid-July 2014, Chief of HCM, Carmen Darville, reported several allegations regarding Mr. Liebbe to me. While I do not recall all of Mr. Liebbe's alleged misconduct Ms. Darville reported to me that day, several things were of particular concern. Perhaps most

importantly, Ms. Darville reported that Mr. Liebbe had tampered with the District's technology to disable the Information Technology ("IT") Department's access to the PSO network server. Mr. Liebbe had engaged in this activity surreptitiously and without authorization from his supervisors in HCM or authorization from high-level IT Department personnel. This reported conduct was so severe that based on this single instance of misconduct, I would have placed Mr. Liebbe on administrative leave pending the results of an investigation.

12. Ms. Darville also reported that Mr. Liebbe had installed cameras in and around PSO that would enable him to monitor his employees. It was my understanding, based on the reports, that Mr. Liebbe had done this without authorization from his supervisors. I believe this was improper and contrary to the more employee-friendly human resources function that I envisioned for PSO. In mid-July 2014, Ms. Darville reported several additional instances of misconduct by Mr. Liebbe, but the two discussed above stand out in my mind the most.

13. Based on the information reported to me by Ms. Darville, I made the decision to place Mr. Liebbe on administrative leave with pay so that an investigation could be conducted regarding the reported misconduct. Dallas ISD's placement of employees on administrative leave with pay is not a disciplinary action.

14. I understand that Mr. Liebbe alleges that he spoke with my driver, Freddie Jackson, regarding Tonya Sadler Grayson's failure to disclose her criminal background on her application for employment with Dallas ISD. As an initial matter, it would have been completely improper and unprofessional for Mr. Liebbe to share a District employee's confidential personnel information, including criminal background information, with my driver, who had no authorization to learn such information for any reason. In any event, I do not recall being aware of Mr. Liebbe's alleged conversations with Mr. Jackson at the time I placed Mr.

Liebbe on administrative leave with pay and decided that an investigation of his reported misconduct should be conducted. Mr. Liebbe's alleged discussions with Mr. Jackson did not influence my decision to place Mr. Liebbe on paid administrative leave or my decision to request an investigation of his reported misconduct.

15. Even if I had known about Mr. Liebbe's alleged conversation with Mr. Jackson, it would not have influenced my decision to place Mr. Liebbe on administrative leave or to request an investigation of Mr. Liebbe's reported misconduct. Based on what Mr. Liebbe contends he told Mr. Jackson—that Ms. Grayson failed to disclose her criminal background on her employment application—he did not tell Mr. Jackson anything I did not already know. Ms. Grayson's failure to disclose her criminal background on her application for employment with the District had been internally reported to me and handled by the Chief of HCM, Carmen Darville, earlier in the year. At the time I placed Mr. Liebbe on administrative leave, I was not aware of any efforts he supposedly made to contact me regarding the performance of criminal background checks on any other District employee.

16. Shortly after Mr. Liebbe's placement on administrative leave, the District retained one of its primary outside counsel, Carlos Lopez, to conduct an investigation related to the conduct in which Mr. Liebbe had reportedly engaged. Because Mr. Liebbe worked in HCM and PSO functions within HCM, it would not be proper for HCM to conduct the investigation of Mr. Liebbe. Further, the work of PSO—a primary investigative body within the District—was important to the District and the Board. As a result, I believed it was important that the District conduct an investigation of Mr. Liebbe in the most objective manner possible. In my mind, outside counsel could perform the most objective investigation of the reports regarding Mr. Liebbe's conduct.

17. On July 23, 2014, I notified the Board of Mr. Liebbe's placement on administrative leave. I also advised the Board that the District's administration had retained outside counsel to review the personnel issues related to Mr. Liebbe. I also advised the Board that I would brief them on any matters regarding Mr. Liebbe's placement on administrative leave and the external investigation during the closed session of the August 14, 2014 Board Briefing. Attached hereto as **Exhibit 5** is a true and correct copy of my email to the Board regarding Mr. Liebbe's placement on administrative leave.

18. Shortly after notifying the Board of Mr. Liebbe's placement on administrative leave, I contacted Denoris Harris, Dallas ISD's Executive Director of Board Services and asked him to place Mr. Liebbe's personnel matter on the August 14, 2014 Board Briefing agenda. Mr. Harris advised me that the discussing regarding Mr. Liebbe would be listed as "personnel" in the Closed Session portion of the August 14, 2014 Board Briefing agenda. Attached hereto as **Exhibit 6** is a true and correct copy of my July 23, 2014 email to Denoris Harris and his responsive email.

19. I had no involvement in the investigation of Mr. Liebbe conducted by the District's outside counsel.

20. Attached hereto as **Exhibit 7** is a true and correct copy of the Board Briefing Agenda and Notice for the District's August 14, 2014 Board Briefing. I recall Mr. Liebbe attending several Board Briefings and Board Meetings since July 2014, but I do not recall any specific Board Briefings or Board Meetings he attended. Mr. Liebbe's attendance at these Board Briefings and Meetings did not upset me or impact me in any way. I do not recall Mr. Liebbe ever speaking at the Board Briefings or Board Meetings he attended. His purpose for attending these Board Briefings or Board Meetings was unclear to me.

21. On September 5, 2014, I received a copy of Carlos Lopez's completed report from his investigation of Mr. Liebbe. Attached hereto as **Exhibit 8** is a true and correct copy of Mr. Lopez's investigative report titled In Re Dallas Independent School District: Investigation Regarding Employee Jeremy Liebbe and the supporting documentation. Attached hereto as **Exhibit 9** is a true and correct copy of a report from Digital Discovery that was part of Mr. Lopez's investigation and findings regarding Mr. Liebbe. That afternoon, I met with Mr. Lopez and Jack Elrod, the District's General Counsel, for approximately an hour and reviewed the investigative report and supporting material. Based on my review of the investigative report and supporting material and the investigative findings regarding Mr. Liebbe's alleged misconduct—including findings that Mr. Liebbe violated District policy and Texas state law—I made the decision to terminate his employment. I made the decision to terminate Mr. Liebbe's employment prior to the conclusion of my meeting with Mr. Lopez and Mr. Elrod on September 5, 2014.

22. While I reviewed and considered all of the findings in the investigative report as part of my decision-making process, I found several substantiated instances of misconduct particularly egregious. For example, the investigation substantiated that Mr. Liebbe tampered with the District's technology equipment. Specifically, Mr. Liebbe attempted to disable the IT Department's access to PSO's network servers without authorization. District employees simply do not get to do that. It is not permissible to have a District employee tamper with the school district's technology or the IT Department's access to District files without authorization and knowledge of the District's IT professionals. Mr. Liebbe's unilateral decision to tamper with the IT Department's access to PSO servers provided ample grounds for termination. In fact, I would have terminated Mr. Liebbe for this misconduct alone because it showed a breathtaking lack of

judgment and demonstrated that Mr. Liebbe believed his authority far exceeded that which was granted to him as Manager of PSO.

23. In addition, the investigative report substantiated that Mr. Liebbe set up his District technology and computers in a manner that allowed him protected access to District files and property even after his placement on administrative leave and suspension of his District account. According to the results of the investigation, Mr. Liebbe used this unauthorized access to delete the contents of his District-issued laptop shortly after his placement on administrative leave. I believed that this constituted destruction of District property and evidence.

24. Of further particular concern, the investigation substantiated that Mr. Liebbe or his staff under his supervision audio-recorded interviews with students without informing parents or principals and without parental consent. Recording student interviews without approval or permission was inappropriate and against District policy and Texas state law. On a more basic level, I believed audio-recording students without parent knowledge and consent set the wrong tone for the type of office I was trying to create within PSO. Mr. Liebbe's decision to make these audio-recordings and his failure to require the PSO investigators to provide parental notification and obtain parental consent before doing so, was significant and would by itself would have resulted in his termination.

25. The investigation of Mr. Liebbe also substantiated that Mr. Liebbe personally installed several surveillance cameras around the PSO office without approval from anyone in his chain of command and without the assistance of District personnel who would typically handle an installation of that equipment. Apart from being wholly unauthorized, I believed the cameras created the appearance of a "big brother" type office, which was contrary to the reason

for creating PSO and its intended function. I believed the cameras were particularly inappropriate for the type of investigative unit Mr. Liebbe was charged with leading.

26. Finally, the investigation substantiated that Mr. Liebbe had begun looking into District employees' personnel files without authorization or an investigative purpose. Personnel files are personal and have a variety of protections. District employees are not permitted to explore the contents of these files out of curiosity, and Mr. Liebbe's decision to do so was inappropriate.

27. The policy violations and lapses in judgment substantiated in the investigative report were so egregious on their face that I viewed termination as the only course of action. The investigation revealed to me that Mr. Liebbe was not suited to lead PSO because he did not understand professional standards himself. After review of the investigative findings, it was my impression that that Mr. Liebbe had been behaving as an FBI or covert agent caricature and had assumed an inflated view of his authority and power in the District. His actions ran counter to the purpose for creating PSO and the function it serves within the District.

28. After Mr. Liebbe was notified of his termination, I sent an email to the Board notifying the Trustees of the District's termination of Mr. Liebbe's employment. I advised the Board that Mr. Liebbe was terminated as a result of the findings in Mr. Lopez's investigative report. Attached hereto as **Exhibit 10** is a true and correct copy of my September 5, 2014 email to the Board.

29. I understand that Mr. Liebbe is now alleging that his termination was retaliatory for several reports or complaints he contends constitute protected First Amendment speech. With regard to any comments or reports Mr. Liebbe made to my driver, Freddie Jackson, I do not recall Mr. Jackson approaching me or informing me about any conversation with Mr. Liebbe.

Mr. Liebbe's alleged report to Freddie Jackson did not in any way motivate or influence my decision to terminate Mr. Liebbe's employment with the District. I have never disciplined an employee for trying to report information to me.

30. The idea that Mr. Liebbe was terminated in retaliation for attending the August 14, 2014 Board Briefing is ridiculous because no one would ever be terminated for attending a Board meeting. I paid no mind to Mr. Liebbe's attendance at the Board meeting, and it did not influence or figure in any way into my decision to terminate Mr. Liebbe.

31. Mr. Liebbe's August 26, 2014 report to the Texas Education Agency ("TEA") was similarly irrelevant to my decision to terminate his employment. I do not recall receiving or reviewing Mr. Liebbe's report to the TEA prior to making the decision to terminate his employment. Similarly, I do not recall individuals speaking with me regarding Mr. Liebbe's TEA report prior to making the decision to terminate his employment. I do not recall that I was even aware of Mr. Liebbe's report to the TEA at the time I made the decision to terminate his employment. Mr. Liebbe's report to the TEA did not factor in any way into my decision to terminate Mr. Liebbe. Indeed, employees, parents, and community members report all manner of complaints about the District daily. To the extent that those reports indicate that there is truly an issue that needs attention, I would regard it as good to know so that something may be done to correct the problem.

32. The letter or email Mr. Liebbe sent to the Board of Trustees on September 3, 2014 also had no impact on my decision to terminate Mr. Liebbe's employment. Once again, I do not recall receiving or reviewing a copy of Mr. Liebbe's September 3, 2014 complaint to the Board prior to making my decision to terminate Mr. Liebbe's employment. I do not even believe I was aware of Mr. Liebbe's September 3, 2014 complaint to the Board before I received the

investigative report, met with Mr. Lopez and Mr. Elrod, and made the decision to terminate Mr. Liebbe's employment. Mr. Liebbe's September 3, 2014 communication to the Board did not motivate or influence in any way my decision to terminate his employment. District employees may and routinely do correspond with Trustees regarding a variety of matters and complaints. I would not have and did not consider Mr. Liebbe's communication with the Board when deciding to terminate his employment.

33. Attached hereto as **Exhibit 11** is a true and correct copy of an email I received on September 5, 2014 that attached Mr. Liebbe's September 3, 2014 letter to the Board and August 26, 2014 letter to the TEA. I do not recall seeing this email prior to my decision to terminate Mr. Liebbe and do not recall ever opening and reviewing its attachments. I received approximately a hundred emails each day as Dallas ISD's Superintendent and generally only read or responded to emails that required my action or response. This particular email was not brought to my attention prior to my decision to terminate Mr. Liebbe.

34. Mr. Liebbe's termination was based solely on the evidence in the investigative report and its supporting materials that substantiated that Mr. Liebbe had engaged in multiple instances of misconduct discussed in detail above. The speech and actions that Mr. Liebbe now claims are protected—his alleged conversation with Freddie Jackson, his attendance at an August 14, 2014 Board Briefing, his August 26, 2014 report to TEA, and his September 3, 2014 communication with the Board—played no role in my decision to terminate his employment.

35. I was not involved in Mr. Liebbe's internal employee grievance regarding his termination. I did not attempt to influence any member of the Board Subcommittee who considered Mr. Liebbe's grievance.

36. Attached hereto as **Exhibit 12** is a true and correct copy of a memorandum I received on or about September 19, 2014 from the Office of Internal Audit regarding the Status of PSO Investigations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of October, 2017.

_____
MIKE MILES