IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JEREMY LIEBBE, §
§
Plaintiff, §
§
VS. § NO. 3:16-CV-02413-L
§
DALLAS INDEPENDENT SCHOOL §
DISTRICT, §
§
Defendant. §

ORAL AND VIDEOTAPED DEPOSITION OF
MIKE MILES
AUGUST 24, 2017
VOLUME 1

ORAL AND VIDEOTAPED DEPOSITION of MIKE MILES, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 24th of August, 2017, from 9:37 a.m. to 1:52 p.m., before Kathy E. Weldon, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Thompson & Horton, LLP, 500 North Akard Street, Suite 3150, in the City of Dallas, County of Dallas, State of Texas, pursuant to Notice and the Federal Rules of Civil Procedure.

EXHIBIT
L

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Austin P. Campbell
LAW OFFICE OF ROB WILEY, P.C.
2613 Thomas Avenue
Dallas, Texas 75204
214.528.6500
214.528.6511 (fax)
acampbell@robwiley.com

FOR THE DEFENDANT DALLAS INDEPENDENT SCHOOL DISTRICT:
Mr. Carlos G. Lopez
Mr. Derrick R. Ward
THOMSON & HORTON, LLP
500 North Akard Street
Suite 3150
Dallas, Texas 75201
972.853.5115
972.534.1495 (fax)
clopez@thlaw
dward@thompsonhorton.com

ALSO PRESENT:
Mr. Justin McAdams, Videographer

INDEX

WITNESS PAGE
MIKE MILES
EXAMINATION BY MR. CAMPBELL 5
Videotape 1 34
Videotape 2 137

CORRECTIONS MADE BY WITNESS 165

SIGNATURE OF WITNESS 166

REPORTER'S CERTIFICATION 167

EXHIBITS IDENTIFIED

1 - Organization Chart 11

2 - Superintendent Qualifications and Duties 17

3 - Letter dated July 17, 2014 from Carmen R. Darville to Jeremy Liebbe 52
4 - E-mail dated July 23, 2014 from Bernadette Nutall to jliebbe@me.com 69

5 - Memorandum dated July 21, 2014, Subject: Requested Action 84
6 - Board Briefing Agenda and Notice, August 14, 2014 94

7 - E-mail string dated August 18, 2014 between Carmen Darville and Tonya Sadler Grayson 107

8 - Letter dated August 20, 2014 to Pete Schulte from Jack Elrod 110
9 - Dallas Morning News Article 114
10 - Letter dated August 26, 2014 to Texas Education Agency from Jeremy Liebbe 120

11 - Letter dated September 3, 2014 to DISD Board of Trustees from Jeremy Liebbe 121

INDEX

EXHIBITS IDENTIFIED
12 - Letter dated August 5, 2014 to Jeremy Liebbe from Carmen Darville 122

13 - Investigation Regarding Employee Jeremy Liebbe 129
14 - E-mail dated September 6, 2014 from Bernadette Nutall to jliebbe@me.com 131

15 - E-mail dated September 5, 2014 from Meredyth E. Hudson to Carmen Darville 137
16 - E-mail dated September 14, 2014 from Mile Miles to Tammy F. Kuykendall 143

17 - Letter dated September 12, 2014 to Amanda Crawford from Leticia D. McGowan 147
18 - Memorandum dated January 23, 2014, Subject: Notification of Texas Education Agency investigations 158

PROCEEDINGS

(All parties present have hereby waived the necessity of the reading of the statements by the deposition officer as required by Rule 30(b)(5).)

THE REPORTER: Are there any stipulations or agreements you would like to state for the record before we begin?

MR. CAMPBELL: The usual stipulations, Carlos?

MR. LOPEZ: Yes, that's fine.

MIKE MILES,

having been first duly sworn, testified as follows:

EXAMINATION

Page 23

Page 24

Page 25

Q. (By Mr. Campbell) Were there any decisions that you made that were reviewed directly by the Board? Were any categories of decisions you would make that were reviewed directly by the Board?
MR. LOPEZ: Objection, form.
Go ahead. You can answer.
A. So the -- the Board has control over several things, like policy. They also had to approve, for example, terminations of principals, several other things that they would -- that that was in their purview.
Q. (By Mr. Campbell) Oh, so the Board would approved terminations of a principal.
What is your understanding of what a principal is?
MR. LOPEZ: Objection, form.
A. Principal of a school is what I'm talking about.

Page 26

Q. (By Mr. Campbell) Okay. Principal of a school?
Okay. I wasn't sure if you meant some sort of term of art there.
A. No. Principal of a school.
Q. Okay.
A. That's an example.
Q. Okay. Did any Board members individually supervise you?
A. No. The Board as a whole supervised me.
Q. Okay. Was there anyone, other than the Board, that would -- or who would supervise your decisions?
MR. LOPEZ: Objection, form.
A. No. Can you clarify? What do you mean? I was the Superintendent. I was the CEO.
Q. (By Mr. Campbell) Okay.
A. I only had one boss. That was the Board as a whole.

Page 35

Page 36

Q. Do you recall if you tended to defer to recommendations from a particular person when it came to decisions to terminate an at-will employee?
A. So I -- I don't know what that means.
Q. If Carmen Darville, for example, said, let's terminate this person, would you generally just defer to her in making that decision to terminate this person?
A. If it was my deci- --
MR. LOPEZ: At-will -- at-will person?
MR. CAMPBELL: At-will, fine.
A. If it -- if it was my decision, no. I would -- I would look at -- just because she brought it, I wouldn't just do it. I would look at the facts. She wouldn't bring it to me unless there were, you know, some sort of case.

Page 37

Page 38



Page 39

Page 40

Page 41

Q. An administrative leave is not supposed to be disciplinary, correct?
A. Correct.

Page 42

Q. Have you ever put someone on administrative leave, paid or otherwise, as a disciplinary measure?
A. No.
Q. Have you ever put someone on -- on administrative leave for leaking something to the press?
A. No.
Q. Have you ever put someone on administrative leave for reporting something to the government?
A. No.

Q. Have you ever put some- -- have you ever put someone on administrative leave for going around the chain of command?
A. No.
Q. Have you ever put someone on administrative leave for trying to contact you about an issue?
A. No.

Page 47

Q. (By Mr. Campbell) What do you recall the

Page 48

allegations being about in terms of, I guess -- okay. What -- what do you recall were the rumors or the allegations -- whatever you want to refer to them as -- about Tonya Sadler Grayson that came up at this time?

MR. LOPEZ: Objection, form.

A. You know, I -- I didn't pay much attention to rumors. I -- I know the situation, and I know people described, you know, almost everything as exaggerated or lots of rumor mills that I didn't participate in. So I can tell you what -- you know, what happened, but --

Q. (By Mr. Campbell) Okay.

A. -- I can't describe the rumors.

Page 49

Q. Do you -- do you recall in 2014 that -- in mid-2014 that, you know, whatever you call -- whatever you want to call it, allegations arose or you started hearing discussion about DISD supposedly failing to perform background checks --

A. So I re- --

Q. -- on employees?

MR. LOPEZ: Objection, form.

Go ahead.

A. I recall that TEA wanted to look, you know, at the number of employees with or without background checks and that HCM was responding to T- -- TEA to show, you know, who was -- who had current background checks, who didn't, and I remember that whole discussion around that.

Page 50



Page 51

Q. Okay. Did Jeremy Liebbe contact you about either Tonya Sadler Grayson or her criminal record or HCM's failure to perform background checks on July 16, 2014?
A. No. I -- I don't believe so.
Q. Did someone else re- -- relay a message from him about those topics to you that day?
A. No.
Q. Your driver, Freddy, didn't?
A. No.
Q. Did anyone else relay messages from someone else about those issues to you that day?
A. About HCM? The background checks?
Q. About -- about HCM, the background checks,

Page 52

about Tonya Sadler Grayson, or any of those topics we've been --
A. No.
Q. -- touching on?
A. I don't think so. I certainly don't remember the specifics of that date.
Q. Okay. You don't recall being shown a text message by your driver, Freddy, from Mr. Liebbe --
A. No.
Q. -- asking to meet?
A. I've never seen a text --
Q. -- or discuss --
A. -- message from -- from Mr. Liebbe from my driver.

Page 53

Q. What was your involvement in the decision to place Mr. Liebbe on administrative leave?
A. I made the decision to place him on administrative leave.

Q. Okay. Why did you place him on admin leave?
A. I -- I believe Ms. Darville came to me, presented several serious allegations, had some evidence for those allegations, seemingly enough for us to do an investigation.
Q. What -- what were the allegations?
A. The allegations were -- and I don't remember everything exactly -- but, one, that he had tampered with technology to the point where IT wouldn't be able

Page 54

to get any information or track e-mails or so that his network and server would be -- PSO's network and server would be out of our system -- the District's system, IT's system, and that he had done it surreptitiously; that he had placed cameras in his trailer that he -- the office building to observe his employees -- and let's see -- that he had -- his -- his folks had taped students without their knowledge or -- well, not without their knowledge. It could have been without their knowledge but without the parent request.
And there were a couple of other things that he was alleged to have done.
Q. Do you remember what those were?
A. I'm trying to recall right this second. If I had -- if I can look at a document, I could tell you specifically at the time she brought -- brought them what they were.
Q. Do you recall when she brought that evide- -- when she brought those allegations to your attention?
A. Oh, I don't know the exact date. Sometime in July, that summer of 20- --
Q. Would it have been July 17th?
A. Yeah, again, if I can look at the document, I could tell you, but it would have been close to this

date here.
Q. Do you recall talking with Carmen Darville about these issues the morning of July 17th?
A. Again, I don't remember the exact date that I spoke to her.
Q. Do you recall --
A. But I remember talking to her about these allegations.
Q. Do you recall talking to her, as well as Tonya Sadler Grayson about these allegations?
A. No. I can't remember Tonya Sadler Grayson. I remember Carmen Darville talking to me about these allegations.
Q. Do you recall meeting with either of them or both of them about these allegations?
A. Carmen Darville --
Q. Okay.
A. -- at least, yes.
Q. Typically how long does it take you to make a decision to put someone at -- on admin leave?
MR. LOPEZ: Objection, form.
A. It really depends on the situation. It could be that, you know -- within that very meeting or discussion.
Q. (By Mr. Campbell) Was that the case in

Mr. Liebbe's case?
A. Yes.
Q. Why was that?
A. Well, if the allegations are serious enough and there's at -- and there's at least some evidence that this is what happened, we would want to investigate. We wouldn't want to wait. We wouldn't want there to be -- you know, we'd want a resolution pretty quickly or as quickly as we could.
And so, you know, we would put him on admin leave with pay so that we could start the investigation.
Q. Okay. And so in your view, these allegations you can recall -- placing cameras, taping students interviews without parental consent, I think you said, and tampering with technology with the District -- those were serious -- serious enough allegations to place him on admin leave?
A. For sure.
MR. LOPEZ: Objection, form.
A. Yes.
Q. (By Mr. Campbell) Okay. And were there other -- there were other allegations, though, that you just can't recall?
A. Yes.

Q. Were those considered in your decision to put him on admin leave?
A. It's -- it's done in its totality, but just the IT alone, I would have placed him on admin leave.
Q. What evidence did Carmen Darville give you of these or the other allegations?
A. I don't remember everything because I -- I know we did investigations, so we tried to keep the two separate. But she had evidence that the IT folks told her that he indeed did tamper with the technology, and so it was evidence like that.
Q. So --
A. And -- and -- and actually were thwarted from -- or the two systems actually had been tampered with.
Q. So there was a statement -- or a statement or multiple statements from IT employees?
A. Well, that's -- that's what I'm saying. I can't remember exactly. At the time she provided me with evidence such -- such as that, and I thought it was sufficient to put him on admin leave with pay.
Q. Okay. Do you recall any other specific evidence that you did consider, other than these statements -- or statement?
A. Let me say, I -- I don't know the details, so

I'd rather not say.
Q. You don't --
A. I don't recall exactly.
Q. Okay.
A. I -- I remember at the time. I'm sorry, but it was three years ago, so it was hard for me to re-create everything that she said --
Q. Okay.
A. -- or showed me at the time.
Q. But you do recall that there was other evidence, other than --
A. Yeah. There was sufficient --
Q. -- these --
A. -- enough evidence on the allegations. For example --
Q. Okay. Okay. Be --
A. -- I think she told me the cameras were actually in the building, so that's evidence.
Q. But, I mean, the evidence of the cameras being there is evidence of what exactly?
A. Evidence that he did not get authority to put the cameras in and that he installed them on his own.
Q. But the mere fact that the cameras were there is mere evidence of that?
A. No. She brought -- she -- like I said, I

Page 59

can't remember the exact specifics of that day, but she probably had evidence from facilities management that he was not authorized and that he, indeed, did install them and that they were there.
Q. She probably had evidence?
A. Again, I'm -- I'm saying it's hard for me to recall the specific evidence that she gave me three years ago, you know, and that's -- that's what I'm saying.
Q. Okay. And you may have already answered this, but how far in advance of him being placed on leave was this meeting?
A. Again, I don't know exactly, but it would have been relatively soon after the meeting that he would -- would have been placed on administrative leave.

Page 60

Q. And you're saying that this IT issue was at that level, or what -- I mean, that was considered serious enough to have it -- to have a --
A. I don't want to have --
Q. -- very quick movement to --
A. I don't want to compare it to situations because every situation is different. I am saying that this IT -- when Carmen brought it to me, I thought it was serious enough to put him on administrative leave fairly quickly.
Q. Okay. Do you recall -- the statements from IT people, do you recall who they were?
A. No. Again, I -- I -- I'm saying again that I'm not very clear on the specifics of that day. You know, I can speak generally.
Q. Okay.
A. But --
Q. I'm -- I'm just trying to ask more specific questions --
A. Right.
Q. -- to see if something does jog your memory. If you -- if you -- if you do happen to recall something if I ask something more specific --
A. No, I -- I don't recall.
Q. Okay. Do you recall one of the allegations

Page 61

that Carmen Darville brought to your attention being that Mr. Liebbe had tried to contact you about the background check issue?
A. No.
Q. Do you recall if one of the allegations was involving Mr. Liebbe trying to contact you about some other issue?
A. No.

Page 62

Q. Okay. And so the distinction was that between those cameras and, for example, the cameras that Mr. Liebbe was alleged to have put up was that he didn't have authorization to put them up?
A. That's part of it.
Q. What's the rest? I mean, is there another part of it?
A. Yes. Another part is it was clear from my trying to reform PSO or to create a PSO distinct from Audit that I didn't want a "big brother" atmosphere that everybody -- there were several times where I mentioned that.
I don't -- I don't like employees being worried that the boss -- me or the Cabinet members -- you know, were going to try to listen in on their private conversations or they couldn't have frank discussions or things like that.
So having cameras everywhere watching folks, to me, creates a big-brother-type atmosphere that I don't think is conducive to effective of work- -- workplace behavior, and so getting

Page 63

authorization is important.

Q. Okay. Do you recall if Carmen Da- -- Carmen Darville told you that he had bought these cameras on his own from Home Depot or a supply store like that?

A. No, I don't remember that. No.

Q. If Mr. Liebbe had been placed -- well, let me rephrase. Strike that.

If Carmen Darville had come to you with an allegation that Mr. Liebbe had tried to contact the media or you or a government agency about the background check issue that we discussed, would you consider that to be a proper justif- -- a proper reason to put him on admin leave?

A. No.

Page 64

Page 65

Page 66

Q. (By Mr. Campbell) Was Mr. Liebbe escorted off of DISD property by DISD police when he was put on leave?

A. I believe he was.

Q. Why was that?

A. Why was he escorted off DISD --

Q. By --

A. -- property --

Q. -- police.

A. -- by the police?

Q. Yeah.

A. If I'm not mistaken, they -- they often escort employees who are placed on admin leave.

Page 67

Page 68

Page 69

Q. (By Mr. Campbell) And there was an investigation into Mr. Liebbe after he was put on leave, correct?
A. Yes.
Q. Was there any -- other than, to your knowledge, what Carmen Darville brought to you, was there any investigation into Mr. Liebbe before he was put on leave while he was manager of PSO?
A. I don't recall any investigation prior to the investigation after admin leave.

Page 70

Q. Okay. And so the placement of Mr. Liebbe on administrative leave was high visibility or high importance to you?
A. Yes.
Q. Why was that?
A. Because PSO and Audit, that the whole structure that we were reorganizing was pretty important to me, and the Board had already shown their interest in the old OCR and the Audit Department, so they would have been interested in anything affecting PSO at a high level.

Page 71

Q. Okay.
A. OPR. It was OPR, yeah.
Q. Was there anything in particular that prompted you to send this e-mail, or was it just your general sense that this was -- because PSO was involved, this was going to be an important issue?
A. Well, I'd -- again, I'd been trying to re- -- change PSO, the whole mindset of the District regarding this "big brother" atmosphere.
Audit was very important. I wanted to keep the two separate, and the Board had already shown their interest in Audit Department, so they should know about it.
Q. Okay. Why -- because Mr. Liebbe was placed on leave on July 17th and the -- this e-mail was sent to the Board on July 23rd, was there any particular reason for the delay in notifying them?
A. No, I don't remember. But, you know, there's a weekend in between, so I'm not sure that there's that much of a delay.
Q. Okay. The letter states that the administration has retained outside counsel to review this personnel issue.
Is it typical for, in your experience, DISD to retain outside counsel to review personnel

Page 72

issues like placing an employee on administrative leave?
MR. LOPEZ: Objection, form.
A. Again, it depends on the context. We -- we do it a lot, and so I don't know what typical means. But we've done it in the past, and it makes sense in this case, too.
Q. (By Mr. Campbell) Okay. You've -- other times in the past, when somebody's been put on administrative leave, you've brought in an outside counsel to investigate the allegations?
A. Again, it's -- it really depends on the context.
Q. Oh, I'm just asking if it happened.
A. It -- it does happen --
Q. Okay.
A. -- that we do that, yes.
Q. Okay. And outside counsel in this case that you're referring to is Mr. Lopez, correct?
A. In this case, yes.
Q. Who made the decision to retain outside counsel?
A. I -- I, along with Jack Elrod, agreed that we should go to outside counsel. Ultimately it's my decision.

Page 73

Q. Okay. And what did you consider in making that decision?
A. I always considered the -- the whole context. In this case, there's -- there may be conflicts of interest. Since PSO works for Human Capital Management, it's kind of hard for the Human Capital Management to review this case directly.
Again, the whole body of PSO and the Audit, you know, a lot of Board interest, so that would even encourage me to look at as an objective party as possible, and outside counsel, in my mind, is the most objective to do any investigation.
Q. Okay. So objectiveness was a concern of yours in deciding to --
A. For sure.
Q. -- retain outside counsel?
So were you aware of any kind of previous relationship between Mr. Lopez and Mr. Liebbe before you retained him as outside counsel?
A. I actually didn't make the decision around who conducted the investigation. That's -- that was left to Jack Elrod.
Q. Oh, you didn't make the decision?
A. I made the decision to go to outside counsel. Who specifically it would be --

Page 74

Q. All right.
A. -- that's up to the legal department.
Q. Were you aware that Mr. Lopez and Mr. Liebbe had spoken on the phone the day that he was placed on administrative leave?
A. No.
Q. Are you aware that they'd worked together previously?
A. No.
Q. Is it typical -- strike that.
Have you previously, when assigning outside counsel to investigate a matter like this, given the decision about who to assign as outside counsel to Jack Elrod?
A. Yes.
Q. Okay. So was that your -- was that your usual practice?
A. Uh-huh, yes.
Q. If you had known that Mr. Lopez and Mr. Liebbe knew each other previously and worked together previously, would that have affected your decision to decide to retain outside counsel?
MR. LOPEZ: Objection --
A. No.
MR. LOPEZ: -- form.



Page 75

Q. (By Mr. Campbell) No?
A. No.
Q. That doesn't seem at odds to your goal to have an objective outside investigator?
A. We have two or three different outside counsel. Jack Elrod assi- -- Elrod assigns them different cases. I trust that the legal department and legal counsel do things legally and objectively.
Q. Okay. So you don't -- you don't have any -- you don't take any issue with their decision who to choose as outside counsel in this situation?
A. No.
Q. Okay. It states that outside counsel was retained to review this personnel issue. Do you know when that started -- when the review started, the investigation?
A. No. I don't -- I don't know the exact date.
Q. Would it have been after July 23rd or before?
A. It -- well, it would have been after July 17, but -- so I -- I don't know.
Q. But would it have been after -- do you know if it would have been after July 23rd?
A. No. I mean, it could -- it could have started right away, but I don't know when it started.
Q. Do you re- -- do you recall what date it was

Page 76

that you met with Jack Elrod about this issue?
A. I -- I believe it was the same time that I spoke with Carmen Darville. Very -- you know, very close in proximity.
Q. But at the same time -- do you mean at the same meeting?
A. At the same meeting or, you know, the same -- within a couple hours or a phone call. I can't remember exactly when he talked to me, but, yes.
Q. Okay. So you made the decision -- so -- and -- and the meetings we're talking about here are the meetings to place Mr. Liebbe on administrative leave and the meetings to retain outside counsel.
So those occurred within a couple hours of each other or maybe were the same meeting?
A. No. I'm talking about talking to Carmen Darville about what Jer- -- what Jeremy Liebbe has allegedly done. Jack and the -- and whether or not to place him on administrative leave. I can't remember when I talked to Jack Elrod about that, but it would have been very close in time to my talks with Carmen Darville.
Q. But it would have been -- would it have been before he was actually placed on leave, Mr. Liebbe?
A. It -- it probably would, but I can't remember

Page 77

exactly when.
Q. I think you said that Jack Elrod used maybe a couple different potential outside counsels --
A. Uh-huh.
Q. -- when he -- when he made the decision. Do you recall who those would be typically, other than Mr. Lopez?
A. No. But, I mean, I'm sure if you, you know, went through the files, you could find them, but I don't remember their names.
Q. I see in the -- the letter -- or, sorry, the e-mail you say, please contact me directly should you have any questions regarding this matter.
Was it pretty typical for you to tell the Board to call you or contact you if they've got questions about a personnel matter like this?
A. Yes. I'm their only employee, and so, yes.
Q. Okay. Did anyone contact you with questions about this issue?
A. I don't -- I don't remember. I don't -- you mean any Board members?
Q. A Board member -- it was sent to the Board members, so, yes.
A. Yeah. No, I don't remember if any Board member contacted me about it.

Page 78

Q. So you made the decision to retain outside counsel. Jack -- Jack Elrod made the decision about who to retain as outside counsel. And at that point what was your involvement -- af- -- after that point, rather, what was your involvement in the investigation into Mr. Liebbe?
A. I don't think I had any involvement.
Q. You didn't provide any directives as to how the investigation was going to be performed?
A. No.
Q. Who was going to be interviewed?
A. No.
Q. Okay. You didn't -- did you meet with Mr. Lopez prior to the decision to terminate?
A. Prior to the decision?
Q. Prior to the decision to terminate.
MR. LOPEZ: Can you -- hold on. If -- Austin, let's have an agreement that if you won't argue waiver in response to my not objecting to attorney-client privilege, I won't object.
MR. CAMPBELL: I'm just asking if he did. I mean -- I mean -- I mean, for all I --

Page 79

MR. LOPEZ: That's fine.
MR. CAMPBELL: For all I know --
MR. LOPEZ: Fair enough. Fair enough. No, no. Fair enough for that -- for that one question. I agree.
A. So I met with Mr. Lopez and Jack Elrod once the investigation was done and they had that report.
Q. (By Mr. Campbell) Okay. So --
A. That was prior to the termination.
Q. But you didn't meet -- you didn't meet with him -- Mr. Lopez, that is -- between the investigation starting and the termination decision?
A. Except for that report --
Q. Okay.
A. -- which happened before the termination.
Q. Okay. Okay. Did you communicate with anyone else about Mr. Lopez's investigation while it was going on?
A. No.
Q. Didn't share your opinions about how it was going or anything like that with anyone?
A. No.

Page 80

Page 81

Page 82

Page 83

Page 84

(Deposition Exhibit No. 5 was marked.)
Q. (By Mr. Campbell) What -- what is this?
A. It's hard to say what this is. There's no "To" line; there's no "cc." It appears to be from Carmen Darville, and it's a series of bullet points on allegations related to Jeremy Liebbe.
Q. Have you seen this before?
A. I saw this yesterday.
Q. That was the first time you saw it?
A. Yes.
Q. Does -- the CRD, that appears to be Carmen Darville's initials?
A. I don't know. I -- I mean, I can assume that it is, but I don't know.
Q. Does this appear to be a list of allegations against Mr. Liebbe? I mean --
A. JL with -- against JL, so it's -- yeah, I think Jeremy Liebbe.
Q. From your recollection of what you and Ms. Darville discussed before Mr. Liebbe was put on leave, are these the allegations that she brought to your attention?

Page 85

A. Some of them are, and so --
Q. Okay.
A. The ones that I related to you earlier.
Q. Are there any that are new or different?
A. So I don't remember all the allegations of that day, but, yes, some of these are not something I would have known at that time.
Q. Like what?
A. So I -- I don't remember the last bullet, for example. She may have talked about it. I don't remember that.
Q. Are there any others that you don't recall?
A. Oh, let's see. I don't remember the fourth bullet. The third bullet is, you know, similar, but not exactly what I recall her talking to me about. I don't remember the fifth bullet being talked about by Carmen with me.
Q. And the others?
A. I'm -- I'm looking at them.
Like I said, the last bullet, I don't remember. And the others are very -- are -- you know, we can argue about the wording or something, but generally speaking, I think she spoke to me about.
Q. The bullet points six, seven, and eight, you mean, are similar to what she talked to you about?

Page 86

A. No. I said the last bullet, number eight, she did not -- I don't remember her mentioning that one. And for example, on bullet number seven, the second to the last one --
Q. Okay.
A. -- that -- you know, I don't remember who -- you know, I don't know of anything about Antoinette, but I remember someone being -- someone assisting him in disconnecting the server.
Q. So then the only difference between -- the only real -- I guess the only real major difference between the second to the last bullet point about Antoinette Saade and what Carmen told you was that, you know, Carmen Darville, I'm assuming didn't mention he took one of his "Hot" investigators to the IT department?
A. No. So, for example, we can parse everything. I don't remember her telling me that Tonya was the one that Jeremy Liebbe told. I just remember that Carmen talked about Jeremy Liebbe going to technology department to distract -- using somebody to distract the IT guys so that he could remove the IT rights from the -- from the server.
That's the gist of that bullet, and that's what I'm talking about.

Page 87

Q. And that's what you --
A. I don't remember her talking about Tonya -- that Je- -- that Jeremy had told Tonya that this was done. Whether he did or not, I -- I don't know.
Q. Wouldn't that be relevant to bring up in a meeting like that if she was going bring evidence to your attention?
A. Like I said, I don't -- I don't remember all of the evidence that she brought.
Q. Right, but is --
A. So how she found out or the evidence she brought that he had indeed tampered with the server, she could have told me about, you know, an IT person saying that this was indeed done, the person whose view was blocked. So that's relevant.
Q. Okay. But, again, you don't recall her -- her giving you a statement from Tonya Sadler Grayson about this or Tonya Sadler Grayson participating in that meeting?
A. Right.
Q. Okay. Bullet point five, which is, Allegation that on or around 7/16, JL used authority to share evidence about Tonya Sadler Grayson with Freddy, Superintendent Mike Miles' driver, in an attempt to get Freddy to share the information with

Page 88

Mr. Miles.
Do you know whether that might be on this?
A. I don't know.
Q. Why -- and this appears to be prepared by Carmen Darville, correct?
A. Correct.
Q. Why would Carmen Darville put this on the list if, as you say, you know, Mr. Liebbe never tried to contact you directly or through Freddy?
A. I don't know.
Q. If it -- how would -- I mean, would you -- are you saying that this was made up by Carmen Darville --
MR. LOPEZ: Objection --
Q. (By Mr. Campbell) -- or you have no idea where this is coming from?
MR. LOPEZ: Objection, form.
A. No. I -- I don't know why it's there.

Page 89

Page 90

Page 91

Q. (By Mr. Campbell) Okay. And so when -- when Carmen -- you and Carmen met, she didn't give you any kind of paper list or any --
A. No.
Q. -- notes?
But there was evidence of some sort in those statements?
A. Yes.
Q. Were those in writing, or did she --
A. No.
Q. -- just relay them to you?
A. She just relayed them to me.
Q. Okay.
A. I don't remember any documents.
Q. There were no -- no recordings, no -- nothing like that?
A. No.
Q. Do you know if any of these allegations against Mr. Liebbe were investigated by Carmen Darville or anyone else?
A. Only during the investigation, in the investigation report.

Page 92

Q. (By Mr. Campbell) Okay. After Mr. Liebbe was put on administrative leave, do you recall speaking with Carmen Darville about the investigation into him or anything else about his leave?
A. No.
Q. Do you recall speaking with Tonya Sadler Grayson about Mr. Liebbe's leave or the allegations against him after he was put on leave?
A. No.
Q. Did you speak with the Board after Mr. Liebbe was put on leave?
A. Just the e-mail to the Board.
Q. You just communicated with them via e-mail --
A. Yes.
Q. -- about Mr. Liebbe --
A. I -- we might have mentioned it. You could probably look at their records at the Board meeting that I said I would tell them about. I don't

Page 93

remember, but --
Q. Okay. So, yeah, you did --
A. -- there probably were minutes or something.
Q. Yeah. You did -- we'll get to that in a minute.
You did speak to them at that Board meeting about Mr. Liebbe?
A. I -- I don't remember, but because I said we would talk about it in the August meeting, we probably did.
Q. That would have been August 14th?
A. Yes.
Q. Okay.
A. But the minutes would reflect --

Page 94

Page 95

And is there any part of this Briefing Agenda and Notice that refers specifically to whether it was intended to refer to Mr. Liebbe's placement on leave?
A. You mean is there anything in writing here that talks about Mr. Liebbe?
Q. Any of these -- are any of these topics on this agenda meant to cover the admin- -- Mr. Liebbe's administrative leave?
A. Yes. So that would have been probably in closed session, 4-A.
Q. 4-A?
Okay. Not 4-B?
A. I'm not sure which -- which one 4-B is referring to, but it could have been.
Q. All right. So either 4-A or 4-B --
A. Yes.

Page 96

Q. -- could be referring to Mr. Liebbe?
A. Yes.
Q. Okay. Do you recall telling the Board that you placed Mr. Liebbe on administrative leave for no appropriate cause?
MR. LOPEZ: Objection, form.
A. For no appropriate cause? I -- I don't do that.
Q. (By Mr. Campbell) Or similar words without appropriate or no good cause?
A. No. I -- well, I don't remember. Like I said, my recollection of talking to the Board about it at this session is pretty vague, but I don't -- I would not have said that, and I don't put people on administrative leave for no cause.
Q. Do you recall saying that to a Board member or to the Board on some other occasion?

Page 97

A. No.
Q. Do you recall a Board member remarking to you on this occasion during this meeting that you were engaging in a fishing expedition against Mr. Liebbe?
MR. LOPEZ: Objection, form.
A. I don't remember that.
Q. (By Mr. Campbell) Do you recall a Board member making that remark to you at some other occasion?
A. No.

Page 98

Page 103

Q. Okay. But you don't -- you don't happen to recall it being something that caused a problem for you that you felt like this was a pain having to deal with this or anything like that?

A. You know, we -- we generally tried to focus on what we were supposed to do without regard to media because if I -- if I did everything based on what the media was doing, I'd never get any real work done.

Page 104

Q. Mr. Liebbe was at this Board meeting on August 14th, correct?

A. I don't remember.

Q. You don't recall seeing him there?

A. No, not any -- at -- not at a specific Board meeting. He may have -- may have been.

Q. You don't recall making eye contact with him there?

A. I remember Mr. Liebbe being at a couple of Board meetings or work sessions but not any specific one.

Q. While he was on leave?

A. I -- I don't remember when Mr. Liebbe was at a work session or Board meeting, but I do remember seeing him at a couple of them.

Q. Do you recall your reaction to seeing him at those meetings?

A. Kind of, like, amused that he was looking at me.

Q. Okay. Can -- what do you mean by that?

A. You know, you have someone who's sitting there, staring at you, it's, to me, you know, a little amusing.

Q. Not upsetting?

A. No.

Page 105

Q. You didn't -- you didn't --

A. You've never been to Board meetings? I mean, there's --

Q. I got you.

A. -- lots of people who are, you know, not happy with you.

Q. Okay. You didn't -- would you prefer if Mr. Liebbe hadn't gone to those meeting or this meeting or whatever meeting you did see him at?

A. It didn't make any difference to me at all.

Q. Okay. Do you recall seeing him with someone or talking to people at the meetings that you did see him at?

A. No, I -- I don't remember.

Q. Do you recall him being with his attorney at the time, Pete Schulte?

A. I -- I don't think I could recognize Mr. Schulte.

Q. At the meetings that you did see him attend -- or the meetings that you did see him attend, did you believe he was going to be spea- -- going to speak at any of those meetings?

A. No. It's just I saw him and didn't pay much attention. That's it.

Q. Did he speak at any of those meetings?

Page 106

A. I don't think so.

Q. Would you prefer if he didn't go to meeting in the future?

A. It wouldn't matter to me one way or the other.

Q. Do you recall if -- in this meeting or some other meeting if you made remarks -- or if you talked to the Board about the allegation about -- against Mr. Liebbe about recording student interviews? Let me rephrase -- let me rephrase that. Sorry. Strike that.

Do you recall if at this Board meeting or some other Board meeting that you brought up the allegation that Mr. Liebbe had supposedly recorded student interviews without parental consent to the Board?

A. I don't -- I don't remember the specifics of that meeting with the Board. Sorry, that was quite a while ago.

Q. And you don't recall meeting with the Board about Mr. Liebbe on any other date?

A. No, I don't.

Q. Do you recall meeting with any Trustees about Mr. Liebbe at any other date?

A. No.

Page 107

Q. Or communicating with them otherwise -- e-mail or phone or --

A. I don't.

Page 108

Page 109

Page 110

29 (Pages 107 to 110)

Notarius Reporting, Inc.
214-324-3733

4effab4a-fa6a-4c34-938e-0307d7709042
APP.478

Page 111

Page 112

Page 113

Q. (By Mr. Campbell) Do you know why this letter was sent to Mr. Liebbe's counsel?
A. No. I mean, I -- it appears, just having read the exhibits, that it was put in his letter. He came on campus. They just reminded him not to.
Q. Do you think it's fair to say that this is an attempt -- regardless of who sent it, as you read it today, do you think it's fair to say this was an attempt to discourage Mr. Liebbe from attending Board meetings?
MR. LOPEZ: Objection, form.

Page 114

A. No. Again, I think it was an attempt to remind him of what his termination letter said and what the practice in the District was. That's all it was. I -- reading it today, that's -- that's all I think it is.
Q. (By Mr. Campbell) To your knowledge, did Mr. Liebbe go on DISD property while on administrative leave, other than this August 14th meeting?
A. I -- I don't know whether he did or not.

Page 119

Page 120

Page 121

Q. (By Mr. Campbell) And what are these exhibits?

A. So No. 10 seems to be a letter from Jeremy Liebbe to the Texas Education Agency dated August 26, and No. 11 is a letter from Jeremy Liebbe to Board of Trustees dated September 3rd.

Q. Have you seen these before?

A. I believe -- because I -- I believe I perused them quickly yesterday.

Q. That's the first time you saw them --

A. Yes.

Q. -- yesterday?

So it was in preparation for this deposition --

A. Yes.

Q. -- that you, okay, first saw them?

What was your reaction upon reading these?

A. I didn't -- I didn't read them closely. I didn't have much of a reaction. It's somebody contacting, you know, TEA about a concern, and somebody contacted the Board about a concern. We have lots of those.

Q. Have -- do you recall hearing this -- these letters discussed by Board members prior to

Page 122

Mr. Liebbe's termination?

A. No, I don't.

Q. Do you recall other DISD employees, Carmen Darville or someone else, discussing this with you, even if you didn't see the letters prior to Mr. Liebbe's termination?

A. No.

Page 123

Page 124

Page 125

Q. (By Mr. Campbell) Okay. The mee- -- the letter states that Mr. Liebbe's an at-will employee, correct?
A. Yes.
Q. And it states, More specifically, you are being terminated because of the following specific reasons and conduct, all of which individually and collectively violate District policy.
You were the recent subject of an investigation. The investigation substantiated allegations that you acted outside the scope of your role of Manager of the Professional Services -- Professional Standards Office.
Is that an accurate description of the reason he was fired?
A. This right here?
Q. Yeah. The statement here. Because the -- the -- it states, You were terminated because of the following specific reasons which individually and

Page 126

collectively violated District policy.
You were the subject of a recent investigation. The investigation substantiated allegations that you acted outside the scope of your role of Manager of Professional Service [sic] Standard Office.
Is it your understanding that that's the reason for his termination?
A. It said the reason for his termination was because the investigation was substantiated, yes.
Q. Okay.
A. And that investigation has very specific allegations in it.
Q. Allegations that he acted outside the scope of his role?
A. So that the reason why I'm being careful in my language, because that's so broad. The investigation itself outlines specific allegations for which he was terminated.

Page 127

[redacted]

Q. Who made the decision to fire Mr. Liebbe?
A. I did.
Q. When did you make that decision?
A. After I read the investigation and was briefed on it.
Q. That would have been the afternoon of September 5th?
A. And, again, I don't know the hour, so sometime on September 5th, I believe.
Q. Was anyone else involved in your decision to fire Mr. Liebbe?
A. So the people who did the investigation.
Q. Mr. Lopez and his firm?
A. And -- and Jack Elrod was there.
Q. They -- they were involved in the decision-making process?
A. And -- well --
MR. LOPEZ: Objection, form.
A. -- so involvement, does that he mean provided me information and providing that? So, yes. But as far as the decision, it's my decision, and I take that pretty seriously, and I -- the buck stops with me.

Page 128

Q. (By Mr. Campbell) And what did you consider in your decision to fire Mr. Liebbe?
A. The investigation.
Q. By "the investigation," do you mean the Report of Investigation?
A. Yes.
Q. Are there any other documents you considered?
A. No. That was it.
Q. That's the only document you considered?
A. Yes.
Q. There are no other factors -- not other documents but no other factors that you considered in making the decision to fire Mr. Liebbe?
A. The -- the documentation was pretty clear, and the investigation -- the only factors are in the investigation.
Q. Mr. Liebbe's attendance at the August 14th -- Mr. Liebbe's attendance at the August 14th Board meeting or any other Board meeting, would that play a role in his termination?
A. Not at all.
Q. Did his August 26th letter to the TEA play any role in his termination?
A. No.
Q. Did his September 3rd, 2014 letter to the

Page 129

Board play any role in his termination?
A. No.
Q. Did his attempt -- or did any attempt by him to contact you about a background check issue prior to his being put on leave play any role in his termination?
A. No.
Q. This termination letter, is this fairly standard, as -- as far as termination letters go?
A. Yes, I would say so.
Q. They're usually pretty short like this?
A. Yes.
Q. Are you aware if he was given more information than what was in this letter at his termination meeting?
A. No.
(Deposition Exhibit No. 13 was marked.)
Q. (By Mr. Campbell) What is this?
A. This is the Investigation Report on Mr. Liebbe.
Q. And you've seen it before?
A. Yes.
Q. And you've seen this particular version of it before?
A. I don't -- I mean, I have to -- I don't know

Page 130

of any other version. I'm not sure what you mean.
Q. You're not aware of earlier versions, earlier drafts of this?
A. No. I mean, I haven't --
Q. You weren't --
A. I mean, I'm -- facing this copy right now, but it looks to be the -- the investigation report. I -- I only know of one version.
Q. The version that you are aware of did not include a date?
A. Correct. That -- well, I don't know if it had a date or not.
Q. So it might have been had a date?
A. I don't remember seeing a date.
Q. Okay. And you reviewed this on, again, September 5th -- on the afternoon of September 5th?
A. I don't know the time.

[redacted]

Q. Okay. How long was the meeting in which you made the decision to terminate Mr. Liebbe?
A. I don't remember how long it was.
Q. Less than 30 minutes?

A. No. I -- probably more, but I don't -- I don't remember.
Q. More than 45 minutes? I'm trying to get some -- some kind of a ballpark.
A. An hour. Probably an hour. I don't -- again, I don't remember.
(Deposition Exhibit No. 14 was marked.)
Q. (By Mr. Campbell) What is this?
A. This is a -- appears to be an e-mail from me to the Board regarding Jeremy -- Jeremy Liebbe's termination.
Q. And it was sent at 6:42 p.m. on September 5th?
A. Yes, it would appear so.
Q. Is this an accurate copy of your e-mail to the Board?
A. I would assume that it is.
Q. And you see it states, This afternoon, Carlos Lopez, the outside counsel investigating allegations against Jeremy Liebbe, briefed Carmen Darville and me on the outcome of that investigation.
That's -- that's accurate on the afternoon of September 5th?
A. Again, I'm going to assume that everything in here is accurate.

Q. And he was fired -- and so, therefore, when it says, Jeremy Liebbe was fired at approximately 6:00 p.m., that's accurate?
A. Yes.
Q. Okay. And so was it fairly typical for you to send an e-mail less than 45 minutes after an employee's termination to the Board?
A. I don't -- I don't know what you mean by 45 minutes, but it's -- and everything is case dependent.
Q. Oh.
A. And in this case, it would not seem odd to me to send an e-mail about the termination to the Board.
Q. Okay. Why is that?
A. Again, because, PSO was an interest. Auditing was an interest to the Board. So they would have wanted to know. If there are media comments about it, they would want to know. So, no, it's not unusual.
Q. And the e-mail also states, Please feel to -- to call me with questions you may have.
Did anybody call you in response to this e-mail?
A. I can't remember anybody calling me about it.
Q. No Trustees or third parties?
A. No.

Page 135

Why would these additional -- this additional information be given to the press and not to Mr. Liebbe?
A. Well, again, there's two different purposes.
Q. Okay.
A. I don't know what was given to Mr. Liebbe because I was not at his termination, and this note says, Because there's been considerable media and public attention, why we would say even a little bit more.
Q. Is it standard practice to give the media more details of an employee's termination than the employee?
A. Once again, I wasn't at the --
MR. LOPEZ: Objection, form.
A. -- termination meeting. I don't know what Mr. Liebbe received.
Q. (By Mr. Campbell) He received this, though, correct, the termination letter?
A. I don't know what he was told verbally. I don't know what pieces of paper he received. I don't know whether he was given the investigation report.
Q. Did you write this press release?

Page 136

A. No. It probably was drafted by communications.
Q. Did you proofread this press release?
A. Probably.
Q. Is it your -- is it your -- your practice, in general, to proofread press releases and things like that before they go out -- or press releases before they go out?
A. No. It -- it really depends on the situation. We -- we put out lots of press releases that I never -- that I never see personally.
Q. So why was this one different?
A. Again, high-level attention, the Board interest, PSO/auditing.
Q. What high-level attention?
A. So the Board was interested in anything related to audits, the restructuring of PSO. Jeremy Liebbe is a high -- you know, was the senior person in PSO, so that's high -- high level enough for me to review a press release.

Page 137

Q. (By Mr. Campbell) So we've been discussing this e-mail, Exhibit 14, from you to the Trustees on September 5th. Are there other instances where a press release was put out about an employee's termination that differed significantly from their termination letter that you're -- that you're aware of?
MR. LOPEZ: Objection, form.
A. Not that I'm aware of.
Q. (By Mr. Campbell) And the -- the letter also says, We are sending you a hard copy of that investigation by courier, right? Did that -- did that -- did that occur?

Page 138

A. I -- I'm assuming it did.

Page 139

Q. But it's asking about this letter that Jeremy Liebbe sent to Trustees. I'm working on a story about it. I'm particularly interested in the allegations that hundreds of employees were hired without proper background checks made. Is that true?

And then it look like Andre Riley sends an e-mail to Justin Coppedge asking to chat about that e-mail.

A. Yeah, that's what it looks like.

Q. And then it looks like Justin -- Justin Coppedge forwarded that e-mail to -- to you and to Carmen Darville and Ann Smisko and Jon -- and Jack Elrod.

A. Yeah, it looks like that.

Q. Okay. So you would have gotten that -- do you recall getting this e-mail?

A. No, I do not.

Q. It was sent about -- it was sent 1:59 p.m.

A. That's what it says on this.

Q. Okay. But you don't recall ever reading it?

A. No.

Q. Do you recall if -- your meeting with Carmen Darville and Carlos Lopez to discuss Jeremy Liebbe, did that occur after this e-mail was sent to your inbox?

Page 140

A. One, I don't recall getting this e-mail; and, two, I don't remember the timing --

Q. Okay.

A. -- of that day.

Q. Do you recall -- do you recall people discussing this inquiry from Jason Trahan at any point either -- either before you fired Mr. Liebbe or after?

A. No.

Q. Okay. How often do you check your e-mails -- or how often did you chick your e-mails when you were Superintendent?

A. So it really depended on what was going on during the day. I didn't have a lot of time during the day to check e-mails. I also had my special assistant check e-mails, and, like I said, DeeDee did a few others, so usually evenings, early morning, weekends.

But folks would bring to my attention anything this needed immediate attention.

Q. And this was -- this was not brought to your attention?

A. I don't remember seeing it during the day during that time frame. And just judging by -- if -- if it's based on news reports, we had news items, social media all the time, so it probably would not

Page 141

rise to the level that I needed to take some action.

Q. But it did get forwarded to you. Do you know Justin Coppedge forwarded it to you, as well as to the general counsel?

A. Justin Coppedge would forward general things to me, things of interest even. So if he wanted my immediate attention, he would have come talk to me about it.

Q. And then after the e-mail was forwarded to you -- those e-mails between -- between Carmen Darville and various people, this document is forwarding Liebbe letter -- or Re: Liebbe letter with some attachments, do you recall Carmen Darville or anyone else asking you about, for example, an e- -- an interview between Gaynell -- Gaynell Williams and Channel 8?

A. No.

Q. Or background check audits related to the issue that Jason Trahan brought to your attention here?

A. No, I don't -- I don't remember what's in -- what he brought. I don't remember what's in this media.

Page 142

Page 147

Page 148

Page 149

Page 150

Q. Do you know if Mr. Liebbe filed a grievance after his termination?
A. I don't -- I don't recall.
Q. Do you recall being involved in any sort of grievance process involving his termination, either as a witness or having an -- outside of a statement or hearing people discuss it?
A. Apart from these legal proceedings?
Q. In the grievance -- the internal grievance in front of the Board, do you recall --
A. I -- I -- I don't recall --
Q. -- any involvement --
A. -- being --
Q. -- in that language?
A. By me, no.
Q. Okay. Do you recall other people discussing that with you, other than your attorney?
A. You know, I don't -- I have a hazy recollection, but I don't remember any specifics.
Q. To your knowledge --
A. I would -- I would not have been -- have been involved in any way.

Page 151

Q. Okay. Is that standard --
A. Yeah.
Q. -- for -- even though you're the decision-maker for the termination, you're not involved in any grievances?
A. Even -- even more so because as a decision-maker, I can't be involved in any of the grievances. I can't influence it in any way.

Page 152

Q. How about during the grievance process? Do

Page 153

you recall discussing the termination or the investigation into Mr. Liebbe with anyone?
A. No. And I also don't remember the grievance process that well.
Q. Okay. What was your -- what was the media environment around Mr. Liebbe's termination like?
MR. LOPEZ: Objection, form.
A. I don't know --
Q. (By Mr. Campbell) What kind -- what kind of media attention did it get?
A. I don't know. He got some obviously, but, again, we -- we -- we tended to ignore most of what went on in the media and just did the job that we needed to do.
Q. And did that apply to Carmen Darville, as well? She would just ignore things in the media and just do her job?
MR. LOPEZ: Objection, form.
A. Again, regardless of the situation, there was media and social media, all kinds of things -- rumors, et cetera, and we ignored most of that and just tried to do the job we needed to do. It didn't mean that we ignored media totally. We had to respond to some things.
Q. (By Mr. Campbell) Do you feel like the media

Page 154

attention around Mr. Liebbe's placement on leave or his termination made your job more difficult?
MR. LOPEZ: Objection, form.
A. Can you -- can you ask that again?
Q. (By Mr. Campbell) Do you feel that the media attention around Mr. Liebbe's placement on leave or his termination, did that make your job more difficult? Was it addi- --
A. No. I mean, I --
Q. -- was it additional work you had to do to deal with?
A. -- I don't think it had much of an impact on what we had to do.
Q. Okay. After Mr. Liebbe's termination, did you hear people within DISD discussing it -- just casually discussing it, or did you hear any rumors about the investigation into Mr. Liebbe?
A. No.
Q. Did you hear DISD employees discuss the media coverage of Mr. Liebbe's termination?
A. No, not that I can recall.
Q. What was your impression of what the reaction among most of the people -- well, scratch that.
Among the Cabinet members, how did the reac- -- what -- what was -- what were people's



Page 155

reactions to Mr. Liebbe's termination?
A. I don't remember our Cabinet talking about Mr. Liebbe, except with Carmen Darville and our lawyer Jack after -- after the termination. We just moved on. Nobody --
Q. Nobody discussed --
A. I don't --
Q. -- any further?
A. -- remember discussion about it -- I don't remember discussing about it --
Q. How about --
A. -- at Cabinet.
Q. How about the Board? Do you -- do you recall any Trustees discussing his termination with you --
A. No.
Q. -- after the fact?
A. Not -- not that I can remember.
Q. Do you recall any Trustees discussing the grievance process with Mr. Liebbe with you?
A. Same, I don't remember that.
Q. Or the investigation?
A. No.
Q. Okay. At -- you know, either after the termination or before --
A. Neither.

Page 156

Q. -- other than the closed-door meeting?
A. Right.

Page 157

Q. Other than Mr. Liebbe, have you ever fired anyone else -- an at-will employee, that is, for going to the media about some issue?
A. No.
Q. Have you ever fired an at-will employee --
A. And you said other than Mr. Liebbe? Is that what your -- your question was?
Q. Oh, okay. Sorry, sorry. Okay. I'll --

Page 158

Mr. -- let me rephrase.
Mr. Liebbe aside --
A. Because Mr. Liebbe was not fired because of that.
Q. Okay. Okay. All right. I appreciate that.
Let me rephrase. Mr. Liebbe aside, leaving aside his case entirely, have you ever fired anyone for going to the media about any particular issue?
A. No.
Q. Have you ever fired anyone for going to the Texas Education Agency with a complaint?
A. No.
Q. Have you ever fired anyone for bringing an issue to the Board --
A. No.
Q. -- of Trustees?
A. No.

Page 160

Do you recall if there were multiple investigations by the TEA into potential problems with DISD's background check system?
A. No, I don't recall that. You know, an investigation takes some time. So multiple inquiries or multiple questions, probably, but not multiple investigations.
Q. Okay. Was this the same investigation -- or do you recall how long this investigation in particular had been ongoing?
A. No, I don't.
Q. Okay. Do you recall how it was resolved?
A. No. I mean, I have a vague recollection that it's more of a technical issue, just reporting, nothing major.
Q. Reporting what?

Page 161

A. No. So just a technical issue of making sure that the fingerprinting did get reported in time or got logged in, not that they weren't being done. That's my vague recollection.

Q. (By Mr. Campbell) Okay. So you may have already said this, but do you recall how this investigation was resolved eventually?
A. I don't remember the -- the detail resolved by No. 1.
Q. No. 1 --
A. And what I said was that I -- I think it

Page 162

was -- there was some technical issues that we weren't reporting -- not that they weren't conducted, just the timing or reporting. But, again, I don't know the specifics. I don't remember it being a big, you know, issue.

Page 163

THE VIDEOGRAPHER: Off the record, 1:52 p.m.

THE REPORTER: Are there any further

Page 164

agreements, stipulations, or requests under Rule 30(b)(5)(C) that need to be put into the record?

MR. LOPEZ: Just in terms of reviewing the transcript, 14 days, that should be plenty to review in case there's any corrections in the transcript. You know, today, that's -- I mean --

MR. CAMPBELL: That's fine.

(Deposition adjourned at 1:52 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: MIKE MILES AUGUST 24, 2017

PAGE LINE CHANGE REASON

I, MIKE MILES, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
MIKE MILES

THE STATE OF ________)
COUNTY OF ___________)

Before me, ________________________, on this day personally appeared MIKE MILES, known to me (or proved to me under oath or through ________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of ________________, 2017.

_________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________

STATE OF TEXAS )
COUNTY OF DALLAS )

I, Kathy E. Weldon, Certified Shorthand Reporter, in and for the State of Texas, certify that the foregoing deposition of MIKE MILES was reported stenographically by me at the time and place indicated, said witness having been placed under oath by me, and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for nor related to any party in this cause and am not financially interested in its outcome.

Given under my hand on this the ____ day of __________, 2017.

______________________________
Kathy E. Weldon, CSR No. 6166
My commission expires 12-31-18
Notarius Reporting, Inc.
Firm No. 659
6510 Abrams Road
Suite 640
Dallas, Texas 75321
Ph. 214.324.3733 Fax 214.432.5415

Time used by each party:
Mr. Austin P. Campbell - 3:29
Mr. Carlos G. Lopez - 0:00
Mr. Derrick R. Ward - 0:00

**Jeremy Liebbe**

**From:** Bernadette Nutall <bwnutall@yahoo.com>
**Sent:** Saturday, September 6, 2014 15:29
**To:** jliebbe@me.com
**Subject:** Fw: Termination of Liebbe

Bernadette Nutall

On Friday, September 5, 2014 6:42 PM, "Miles, Mike" wrote:

Trustees,
This afternoon, Carlos Lopez, the outside counsel investigating allegations against Jeremy Liebbe, briefed Carmen Darville and me on the outcome of that investigation. All seven inquiries were substantiated. We are sending you a hard copy of that investigation by courier.
As a result of the investigation and findings, the District terminated Jeremy Liebbe at approximately 6:00 p.m. We will make the following statement:
*Dallas ISD announced that it has released its lead investigator based on the findings of a month and a half-long review. The review, conducted by outside counsel, found multiple instances of poor behavior and decision-making, and violations of law and the Texas Education Code that warranted the termination of Jeremy Liebbe, who had managed the Professional Standards Office since March of 2014.*
*As a matter of practice, Dallas ISD does not comment on personnel issues. "It is unfortunate that this matter has been made so public without the District being able to comment," said Andre Riley, Director of News and Information. "Because there has been considerable media and public attention, we believe it is important for the public to know the outcome of the investigation," said Mr. Riley. "That being said, to respect all involved, we will not discuss the details of the investigation or resulting action."*
Please feel free to call me with questions you may have.
Mike
CONFIDENTIALITY NOTICE: This email message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential student and/or employee information. Unauthorized use and/or disclosure is prohibited under the federal Family Education Rights & Privacy Act (20 U.S.C. §1232g, 34 CFR Part 99, 19 TAC 247.2, Texas Government Code 552.023, Texas Education Code 21.355, 29 CFR 1630.14(b)(c)). If you are not the intended recipient, you may not use, disclose, copy or disseminate this information. Please call the sender immediately or reply by email and destroy all copies of the original message, including attachments.